```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :
TOTAL EQUITY CAPITAL, LLC,                                        :
                                                                  :
                                Plaintiff,                        :    15-CV-4168 (JMF)
                                                                  :
                -v-                                               :    OPINION AND ORDER
                                                                  :
FLURRY, INC., et al.,                                             :
                                                                  :
                                Defendants.                       :
                                                                  :
------------------------------------------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 06/01/2016

JESSE M. FURMAN, United States District Judge:

Plaintiff Total Equity Capital, LLC ("TEC") brings this case against Flurry, Inc. ("Flurry") and Simon Khalaf, Flurry's President and Chief Executive Officer (together with Flurry, "Defendants"). TEC alleges that Flurry and Khalaf committed securities fraud in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78(b), 78(t)(a), and Securities Exchange Commission Rule 10b-5, 17 C.F.R. § 240. Defendants now move to dismiss TEC's claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons stated below, Defendants' motion is GRANTED.

## BACKGROUND

The following facts are taken from the Amended Complaint and assumed to be true for the purposes of this motion. *See, e.g.*, *Hogan v. Fischer*, 738 F.3d 509, 513 (2d Cir. 2013). Flurry, at the time relevant to this motion, "was a non-public Delaware corporation that provided mobile application analytics and data-powered advertising platforms." (Am. Compl. (Docket No. 13) ¶ 2). Khalaf was Flurry's President and CEO. (*Id.* ¶ 3). Flurry "provided various products that enable users to measure consumer behavior, advertise to the right audience, and

monetize their audience." (*Id.* ¶ 2). Its products included, among others, Flurry Analytics, an application that helped users understand how consumers interact with mobile applications; AppSpot, which generates relevant advertisements that result in "more clicks, conversions, and revenue"; and AppCircle, which assists corporations in building audiences for their applications. (*Id.*). As a private company, Flurry was not required to file, and did not file, financial disclosures with the Securities and Exchange Commission. (*See id.* ¶ 33).

In September 2013, the website *Business Insider* published an article titled "Flurry CEO Says IPO Is Inevitable As Its Mobile Ad Reach Overtakes Google's." (*Id.* ¶ 16). That article stated, without citation, that "Flurry has a net revenue run-rate of about $100 million[,] . . . 150 employees and has taken $50.5 million in funding from investors." (*Id.*). It quoted Khalaf as saying that he "'consider[s] an IPO an entrance . . . . We don't have a choice, our volume is too high and our scale is too big for anyone to absorb us.'" (*Id.*). The article also reported that Khalaf admitted that Flurry is not yet profitable, and quoted him saying that "'[i]n 2014 we're profitable maybe.'" (*Id.*). Khalaf stated in the article that "'[t]he cost of analytics is huge,'" and the article reported — again, without citation — that "Flurry is spending $28 million a year on analytics." (*Id.*). Another *Business Insider* article, published on September 26, 2013, called Flurry "one of 'The Hottest Pre-IPO Adtech Startups Right Now'" and reported that Flurry had estimated revenues of $100 million. (*Id.* ¶ 21). The Complaint does not say whether that article provided a source for the number. (*Id.*). An article about Flurry in the November 18, 2013 issue of *Forbes* referred to Khalaf and reported that "[h]e says Flurry is on pace to generate $100 million a year and 'might' be profitable next year." (*Id.* ¶ 23). Flurry posted links to the *Business Insider* articles on its website. (*Id.* ¶¶ 18, 21).

Based in part on these articles, and Khalaf's statements in them, TEC purchased 65,000 shares of Flurry common stock on April 21, 2014, from the former Chief Financial Officer of Flurry through "an online service that matches buyers and sellers of pre-IPO securities." (*Id.* ¶¶ 4, 20, 22, 26). TEC paid $5.20 per share. (*Id.* ¶ 4). Exactly three months later, on July 21, 2014, Yahoo! Inc. ("Yahoo") purchased Flurry for $2.36 per share. (*Id.* ¶¶ 8, 27). In connection with the purchase, Flurry disclosed a July 2014 audit prepared by Pricewaterhouse Coopers ("PwC") that analyzed the company's financial status for the prior few years. (*Id.* ¶¶ 28-32; *id.*, Ex. A).[1] The audit showed, among other things, that, between 2012 and 2013, Flurry's cash and cash equivalents had declined from $28 million to $15 million; that the company's net revenues declined from $60 million to $48 million; and that its net loss grew from $8 million to $30 million. (Am. Compl. ¶¶ 29-30). In notes, PwC reported that Flurry had, until then, "been funded primarily by issuing equity securities and, to a lesser degree, from sales transactions with customers" and expressly cautioned that there was "substantial doubt" about Flurry's "ability to continue as a going concern beyond December 31, 2014." (*Id.* ¶ 31). TEC now alleges that its loss of $184,290.19 — representing the difference between what it paid for the Flurry shares and what it received for those shares from Yahoo — is attributable to Defendants' misconduct, which artificially inflated the price of the Flurry shares. (*Id.* ¶¶ 8, 37-39).

## LEGAL STANDARDS

"In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 319-20 (S.D.N.Y. 2012) (citing

---

[1] The audit letter is mistakenly dated 2013, instead of 2014. (*See* Defs.' Mem. Law Supp. Mot. To Dismiss Am. Compl. (Docket No. 15) 5 n.2).

3

*Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009)).  The Court will not dismiss any claims pursuant to Rule 12(b)(6) unless the plaintiff has failed to plead sufficient facts to state a claim to relief that is facially plausible, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), that is, one that contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  More specifically, a plaintiff must allege facts showing "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  A complaint that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  Further, if a plaintiff has not "nudged [its] claims across the line from conceivable to plausible, [those claims] must be dismissed."  *Id.* at 570.

Because it alleges securities fraud, TEC must also satisfy the heightened pleading requirements of both Rule 9(b), which requires that the circumstances constituting fraud be "state[d] with particularity," Fed. R. Civ. P. 9(b), and the PSLRA, which requires that scienter — that is, a defendant's "intention to deceive, manipulate, or defraud" — also be pleaded with particularity, *Tellabs, Inc. v Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (internal quotation marks omitted).  To satisfy Rule 9(b), a plaintiff "must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)).  To satisfy the PSLRA, a complaint must, "'with respect to each act or omission alleged to [constitute securities fraud], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (quoting 15 U.S.C. § 78u-4(b)(2)(A)).

4

# DISCUSSION

TEC seeks to hold Flurry and Khalaf liable for securities fraud under Section 10(b) and Rule 10b-5 and to hold Khalaf liable, as a "control person," under Section 20(a).  To state a claim that Flurry or Khalaf "made material misrepresentations or omissions in violation of § 10(b) and Rule 10b-5," TEC must plausibly allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011) (internal quotation marks omitted); *see IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015).  To state a claim for control person liability under Section 20(a), TEC must, at a minimum, plead a plausible primary violation of Section 10(b).  *See, e.g.*, *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996); *In re China Valves Tech. Sec. Litig.*, No. 11-CV-0796 (LAK), 2012 WL 4039852, at *8 (S.D.N.Y. Sept. 12, 2012).

Defendants argue that TEC's claims fail for any of several reasons: because TEC does not plausibly allege that Flurry or Khalaf made a material misrepresentation or omission, because TEC does not properly allege scienter under the heightened pleading standards of the PSLRA, and because TEC fails to plausibly allege loss causation and reasonable reliance.  The Court agrees with TEC's first two points and therefore does not reach its others.

**A.  Material Misrepresentation or Omission**

To be actionable under the PSLRA, an alleged misstatement or omission "must be one of existing fact, and not merely an expression of opinion, expectation, or declaration of intention."  *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 397 (S.D.N.Y. 2006) (internal

quotation marks omitted). Statements that "are expressions of optimism or projections about the future" are actionable only "if they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them." *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) (citation omitted); *see In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 557 (S.D.N.Y. 2004) ("It is well settled that a complaint alleging violations of the securities laws may not rely upon . . . ordinary expressions of corporate optimism."). In other words, "liability lies only to the extent that the statement was both objectively false and disbelieved by the defendant at the time it was expressed." *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011); *see City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 67-68 (2d Cir. 2012) (per curiam) (applying *Fait*'s reasoning to claims under Section 10(b)); *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) ("[C]ompanies must be permitted to operate with a hopeful outlook.").

Applying these standards here, TEC fails to identify any actionable misstatements or omissions by Defendants. As an initial matter, many of the statements that TEC bases its claims on — including, for example, that an IPO was "inevitable" (Am. Compl. ¶¶ 16, 21); that Flurry had "a net revenue run-rate of about $100 million" (*id.* ¶ 16); and that Flurry was "spending $28 million a year on analytics" (*id.*) — are not necessarily even attributable to Defendants. *See, e.g.*, *Janus Capital Grp. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) ("One 'makes' a statement by stating it. . . . For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right."); *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 264-65 (2d Cir. 1993) (affirming the district court's dismissal of allegedly fraudulent statements that were

6

unattributed to a particular speaker, even though the plaintiff "allege[d] on information and belief that the unattributed statement was made by an agent of the defendant"); *In re Gaming Lottery Sec. Litig.*, No. 96-CV-5567 (RPP), 1998 WL 276177, at *6 (S.D.N.Y. May 29, 1998) ("[C]orporate defendants cannot be held liable for overly optimistic statements in analysts' articles that are not attributed to specific corporate agents.").

Those statements do not appear in quotation marks and are not otherwise directly attributed to Khalaf (or any other Flurry representative), and TEC pleads no facts showing that Defendants were involved in reviewing or approving the articles. *Schwartz v. Novo Indus. A/S*, 658 F. Supp. 795, 799 (S.D.N.Y. 1987) ("[P]laintiff fails to demonstrate how . . . it would be fair to draw an inference of fraud from a statement appearing in a news article over which defendant had less than complete control."); *cf. In re Pfizer Inc. Sec. Litig.*, No. 04-CV-9866 (LTS) (HBP), 2012 WL 983548, at *4 (S.D.N.Y. Mar. 22, 2012) (holding that the plaintiffs had adequately pleaded facts attributing comments in Pfizer's press releases to individual defendants where the complaint stated that the defendants "'were involved in drafting, reviewing and/or disseminating the false and misleading financial statements that were issued by Pfizer'"). And while the Amended Complaint does allege that Flurry linked to two of the articles on its website (Am. Compl. ¶¶ 18, 21), TEC does not cite — and the Court has not found — any authority for the proposition that merely linking to an article makes every statement in that article ones over which the company has "ultimate authority." *Janus*, 564 U.S. at 142.

In any event, even if the statements at issue were attributable to Defendants, they would not be actionable. First, the Amended Complaint does not plausibly allege that any of the statements was false when made. Notably, TEC relies solely on the July 2014 PwC audit in asserting that Khalaf's purported statements were false. But that audit merely reported that

7

Flurry had not been profitable in 2013 — a fact that Khalaf readily admitted to the *Business Insider* reporter.  (*See* Am. Compl. ¶ 16 ("'There is one more thing Khalaf is unusually direct about.  Flurry is not yet profitable, he says.'" (excerpting the September 20 *Business Insider* article))).[2]  Whereas PwC made no forecasts about Flurry's performance in 2014 or later, Khalaf's statements in the articles focused almost exclusively on Flurry's future (in some instances, without even specifying a time horizon) — on the likelihood of the company turning a profit in 2014, on its "revenue run rate" (a term relating to projected revenues, *see, e.g.*, *Run Rate*, Investopedia, http://www.investopedia.com/terms/r/runrate.asp (defining "run rate"); *see also In re Century Bus. Servs. Sec. Litig.*, No. 99-CV-2200, 2002 WL 32254513, at *2 (N.D. Ohio June 27, 2002) (discussing revenue run rates)), and on the likelihood of an IPO.  Those statements may well have proved to be overly optimistic, but there is nothing in the PwC audit issued ten months later or Flurry's later performance that plausibly suggests, let alone shows, that Khalaf knew them to be false when he made them.  *See, e.g.*, *In re Nokia Corp. Sec. Litig.*, No. 96-CV-3752 (DC), 1998 WL 150963, at *6 (S.D.N.Y. Apr. 1, 1998) ("For example, Statement Two to the effect that '[t]his positive trend in profit development is projected to continue through the rest of 1995' is not actionable because it is a general statement of optimism."); *Hershfang v. Citicorp*, 767 F. Supp. 1251, 1256 (S.D.N.Y. 1991) (finding that various statements attributed to Citicorp executives in *Wall Street Journal* articles were statements of opinion and not actionable); *Schwartz*, 658 F. Supp. at 799 (rejecting allegations of

---

[2]     TEC argues that the $28 million analytics figure was misleading because it was designed to imply that Flurry's "lack of profitability was only due to the approximately $28 million per year that Flurry spent on analytics."  (Pl.'s Mem. Law Opp'n Defs.' Mot. To Dismiss (Docket No. 17) ("Pl.'s Opp'n") 1).  TEC does not allege that the $28 million figure is inaccurate, however, and fails to identify any statement attributable to Khalaf that suggests the cost of analytics was in fact the only reason for Flurry's lack of profitability.

fraud where the allegedly fraudulent statement was "nothing more than a judgment subsequently found to have been overly optimistic" and the plaintiff "fail[ed] to offer a single objective fact to suggest that the prediction was other than an honestly held view").

Of course, statements with respect to future performance are not *per se* immune from liability under the securities fraud laws. Such statements are actionable, however, only if "they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them." *Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d at 557; *see, e.g.*, *In re Symbol Techs., Inc. Sec. Litig.*, No. 05-CV-3923 (DRH) (AKT), 2013 WL 6330665, at *7 (E.D.N.Y. Dec. 5, 2013) ("[T]he alleged revenue projections do not constitute inactionable puffery because the projections provided specific ranges for future revenues."); *Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Arbitron Inc.*, 741 F. Supp. 2d 474, 484-85 (S.D.N.Y. 2010) (holding that public statements regarding favorable testing data were actionable because the "positive statements flew in the face of" criticism that the company was receiving at the same time and the statements were "of specific, present-day fact, not optimistic predictions of the future"). Here, none of the statements at issue rises to that level; instead, most amount to speculation or "ordinary expressions of corporate optimism." *Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d at 557.[3] Accordingly, TEC fails to plausibly allege a material misrepresentation or omission by either Defendant, and its claims under Section 10(b) and Rule 10b-5 must be dismissed on that basis alone.

---

[3]   The statement that a Flurry IPO was "inevitable" could not reasonably be construed as a specific fact or "guarantee" and, in any event, was not a statement attributed to Khalaf himself. (*See* Am. Compl. ¶ 16). The comments about Flurry's "revenue run rate" are similarly inactionable. The term is nowhere defined in the Amended Complaint and the ballpark figures in the articles are not tied to any time horizon; accordingly, there is no basis to assert that the statements are false. (*See id.* ¶¶ 16, 18).

**B. Scienter**

In any event, TEC's claims under Section 10(b) and Rule 10b-5 must be dismissed for a related, albeit independent, reason: failure to adequately plead scienter. As noted, under the PSLRA, a plaintiff must plead scienter — that is, a defendant's "intention to deceive, manipulate, or defraud" — with particularity. *Tellabs*, 551 U.S. at 313 (internal quotation marks omitted). To meet that requirement, a complaint must, "'with respect to each act or omission alleged to [constitute securities fraud], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *ATSI Commc'ns*, 493 F.3d at 99 (quoting 15 U.S.C. § 78u-4(b)(2)(A)). The "strong inference" must be "more than merely plausible or reasonable." *Tellabs*, 551 U.S. at 314. The necessary inquiry is "inherently comparative." *Id.* at 323. That is, the Court "must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323-24. A complaint alleging securities fraud will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

In this Circuit, a plaintiff may satisfy the scienter pleading requirement in either of two ways: "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Comm'cns*, 493 F.3d at 99. In general, "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000). Here, TEC implicitly concedes, as it must, that the Amended Complaint includes no allegation that Khalaf was in possession of reports or statements contradicting his rosy declarations at the time that he

10

made them.  Instead, TEC argues that, "when viewed holistically, the facts collectively give rise to a strong inference of Khalaf's conscious misbehavior or recklessness."  (Pl.'s Mem. Law Opp'n Defs.' Mot. To Dismiss (Docket No. 17) ("Pl.'s Opp'n") 4).  More specifically, TEC cites four particular "facts": (1) "the magnitude and duration of the misstatements"; (2) "the close proximity of Khalaf's misstatements to the revelation of the truth"; (3) Khalaf's motive; and (4) that the misstatements concerned Flurry's "core business."  (*Id.*).

TEC's first three points are easily dismissed.  First, as TEC itself acknowledges (Pl.'s Opp'n 14), "allegations regarding the magnitude of the fraud" are not capable of serving "as an independent basis for scienter."  *In re ShengdaTech, Inc. Sec. Litig.*, No. 11-CV-1918 (LGS), 2014 WL 3928606, at *9 (S.D.N.Y. Aug. 12, 2014).  Second, Khalaf's statements and the "revelation of the truth" were hardly "close" in time; they were separated by between eight and ten months.  *Cf. Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 385-86 (E.D.N.Y. 2003) (declining to find an inference of scienter where two months elapsed between the allegedly fraudulent statement and an "announcement of problems" (collecting cases)); *In re AnnTaylor Stores Sec. Litig.*, 807 F. Supp. 990, 1006-1007 (S.D.N.Y. 1992) (finding that a follow-up statement made twenty days after the allegedly fraudulent statement was sufficiently close in time to raise an inference of scienter).  Third, the only allegation with respect to motive is that Khalaf "was motivated to artificially inflate the price of Flurry securities . . . because . . . Flurry had been funded primarily by issuing equity securities.  Therefore, the higher the price of those securities, the greater the proceeds available to the Company to fund ongoing operations."  (Am. Compl. ¶ 36 (internal quotation marks and alteration omitted)).  But "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive.'"

11

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).

TEC's final point implicates the "core operations doctrine," which "permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business, which include matters critical to the long term viability of the company and events affecting a significant source of income" — which, in turn, permits an inference that the company and senior executives knew or should have known if statements concerning those core operations were false or misleading. *Hensley v. IEC Elecs. Corp.*, No. 13-CV-4507 (JMF), 2014 WL 4473373, at *5 (S.D.N.Y. Sept. 11, 2014) (internal quotation marks omitted). (*See* Pl.'s Opp'n 14-15). It is far from clear, however, that the core operations doctrine remains valid in light of the PSLRA. *See, e.g.*, *Plumbers & Pipefitters*, 741 F. Supp. 2d at 490 ("Whether a plaintiff may rely on the core operations doctrine in light of the PSLRA has not been decided by the Court of Appeals for the Second Circuit. Those Courts of Appeals that have addressed the question have found that it is no longer viable in most situations." (citation omitted)); *see also New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 n.3 (2d Cir. 2011) (summary order) (declining to address arguments under the core operations doctrine). Further, even if the doctrine does remain valid, core operations allegations would "constitute supplementary but not independently sufficient means to plead scienter." *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011); *see New Orleans Emps. Ret. Sys.*, 455 F. App'x at 14 n.3 (noting with approval the parties' agreement "that allegations of a company's core operations . . . can provide supplemental support of scienter, even if they cannot allege establish scienter independently").

Here, there are no allegations suggesting that Khalaf would have been aware of specific financial figures for the company or that he would have any reason to know or believe that his statements were contradicted by the facts at the time he made them.  *See, e.g.*, *Goplen v. 51job, Inc.*, 453 F. Supp. 2d 759, 770 (S.D.N.Y. 2006) ("[E]ven assuming the existence of a sharp downturn at that time, plaintiffs fail to show that any defendants knew or should have known about it."); *In re Nokia*, 1998 WL 150963, at *11-12 (finding insufficient support for an inference of scienter where the plaintiffs claimed that the defendants were making positive statements about the company's financial outlook at the same time that profits were declining); *Hershfang*, 767 F. Supp. at 1257 ("Here, plaintiff has failed to allege particular facts demonstrating the knowledge of defendants *at the time* that such statements were false." (emphasis added) (internal quotation marks omitted).  For example, this is not a case where the Complaint pleads facts showing that Khalaf was provided with financial data on a regular basis or worked closely with company analysts.  *Cf. In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) ("[T]he second amended complaint contains detailed allegations as to what defendants knew on a daily, weekly and monthly basis about the retail trade of Goosebumps books, while at the same time making public statements that painted a different picture.").

Ultimately, even taking all of the "facts" upon which TEC relies together, its allegations of misrepresentation and recklessness are far less "compelling" than the nonculpable explanation presented by Defendants and apparent from the face of the Complaint: that the CEO of a relatively small, young tech company was overly optimistic about the company's growth and potential and was proved to be so ten months later.  (*See* Defs.' Mem. Law Supp. Mot. To Dismiss Am. Compl. (Docket No. 15) 9-13).  Given Flurry's performance in 2012 and 2013, Khalaf's "projections may have been unduly optimistic and even negligent.  But negligence

alone is insufficient to demonstrate the extreme departure from standards of ordinary care necessary to show recklessness." *Shemian v. Research in Motion Ltd.*, 570 F. App'x 32, 36 (2d Cir. 2014) (summary order).  Accordingly, TEC's claims must be and are dismissed.

## CONCLUSION

For the reasons stated above, TEC's claims under Section 10(b) and Rule 10b-5 must be and are dismissed.  It follows that its claim for control person liability under Section 20(a) also fails.  *See, e.g.*, *First Jersey Sec., Inc.*, 101 F.3d at 1472.  That leaves only the question of whether TEC should be granted leave to amend its complaint for a second time.  TEC does not ask for leave to amend, and the Court declines to grant it *sua sponte*, both because amendment would likely be futile and because, in granting leave to file a first amended complaint, the Court expressly warned that TEC would not be given another opportunity to address the issues raised in Defendants' motion to dismiss.  (*See* Docket No. 11).  *See, e.g.*, *Clark v. Kitt*, No. 12-CV-8061 (CS), 2014 WL 4054284, at *15 (S.D.N.Y. Aug. 15, 2014) (holding that the plaintiff's failure to remedy the complaint's deficiencies identified by an earlier motion to dismiss "is alone sufficient grounds to deny leave to amend"); *see also, e.g.*, *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (affirming the district court's denial of leave to amend in part because of the previous opportunities that the plaintiff had received to amend the complaint).

The Clerk of Court is directed to terminate Docket Nos. 14 and 19 and to close this case.

SO ORDERED.

Date: June 1, 2016
New York, New York

_____
JESSE M. FURMAN
United States District Judge